**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| JAMIE ROURK, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION FILE NO: |
| | * | 4-12-CV-42 (CDL) |
| BANK OF AMERICA, N.A., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jamie Rourk ("Jamie") respectfully submits this response to Defendant Bank of America N.A.'s ("BANA") Motion for Summary Judgment, pursuant to Local Rule 56.

**STATEMENT OF FACTS**

Jamie purchased her home at 4506 Forest Road in Columbus, Georgia in March, 2000 by executing a note ("Note") in the amount of $44,413.00 with New South Federal Savings Bank ("Loan"). (SMF ¶ 1). To secure her purchase, Jamie executed a security deed for the home ("Security Deed"; together with the Note, the "Loan Documents"). (*Id.* ¶ 5). At some point, Bank of America ("BANA") took over servicing Jamie's Loan. (*Id.* ¶ 1). The Loan Documents each provide that should Jamie default on her payments, BANA could accelerate the full amount remaining due on the Loan. (*Id.* ¶¶ 3, 6). These provisions are specifically limited by the relevant regulations promulgated by the Secretary of Housing and Urban Development ("HUD Regulations") which are incorporated into each of the Loan Documents as contract terms. (*Id.* ¶¶ 4 ("This Note does not authorize acceleration when not permitted by HUD regulations."), 7 ("This Security Instrument does not authorize acceleration or foreclosure if not permitted by

[HUD Regulations].")).

Pursuant to the Security Deed, Jamie had the right to reinstate the Note, even after foreclosure proceedings began, by tendering "in a lump sum all amounts required to bring Borrower's account current." (*Id.* ¶ 9). If her home was sold at foreclosure, BANA was required to apply the proceeds from the sale "in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney's fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it." (*Id.* ¶ 10).

Jamie entered Chapter 13 Bankruptcy in June 2004 and completed it in February, 2010. (*Id.* ¶ 11). The bankruptcy trustee made, and BANA accepted, all of the monthly payments during the bankruptcy.[1] (*Id.* ¶¶ 13-14).  In late February, 2010, the trustee sent a letter to BANA stating that Jamie's account would be current through March, 2010 and included an account statement to that effect ("Completion Letter"). (*Id.* ¶¶ 15-16).  Jamie took over the monthly payments in April, 2010, making the April and May payments by electronic funds transfer directly to BANA. (*Id.* ¶¶ 17, 19, 22). Although BANA initially accepted the payments, it returned them over one month after accepting each, claiming that Jamie had to make the payments in certified funds. (*Id.* ¶¶ 20-21, 23-24, 25-27). When Jamie attempted to make the June payment, BANA refused to accept it. (*Id.* ¶ 28).  Even though the Loan should have been current through June, 2010 (but for BANA's wrongful rejection of Jamie's payments), BANA informed Jamie on June 1 that her home was in foreclosure because Jamie was purportedly nine months behind on her payments.[2] (*Id.* ¶ 29).

---

[1] While she was in bankruptcy, Jamie periodically received statements from BANA that showed her escrow account to be negative, but BANA never changed the amount of her monthly payment during this time. (J. Rourk Depo. 32:11-20; Def.'s SUMF Exs. 24-26, 29-32; *see* Def.'s SUMF Ex. 11).
[2] Jamie did not receive any notices during or after her bankruptcy stating that the bankruptcy trustee was making or had made incomplete payments or that the apparent deficiency in her escrow account required her to make increased payments.  (*Cf.* Def.'s SUMF Ex. 11 at 12-17 (online escrow analysis dated

Jamie immediately began contacting BANA, in writing and by phone, to have BANA correct its records. (*Id.* ¶¶ 32, 49-50, 58). Even though Jamie faxed the Completion Letter to BANA, called BANA more than 15 times between June 10 and August 2, 2010, and obtained counsel who also wrote to BANA, BANA failed to correct its records prior to August 2.[3] (*See id.* ¶¶ 60-62, 66-67, 155-58).

Despite her letters and numerous calls, Jamie received three different documents from BANA, each of which quoted a different amount needed to bring the Loan current. (*Id.* ¶¶ 41, 74, 80). First, Jamie received a "Reinstatement Calculation" dated June 22, 2010, showing that Jamie purportedly was behind in her payments by **11 months**, even though she had provided BANA with proof that the Loan was current as of March, 2010 and even though BANA never notified her or the bankruptcy trustee that the payments made after September, 2009 supposedly were deficient. (*Id.* ¶ 39). The Reinstatement Calculation stated that Jamie owed $2,535.76, including foreclosure-related fees and charges, to reinstate her Loan. (*Id.* ¶¶ 40-42).

Just over one month later, Jamie received a "Notice of Intent to Accelerate" dated August 11, 2010, which also erroneously showed that Jamie was **11 months** in arrears ("First August Notice"). (*Id.* ¶¶ 71-72). According to the First August Notice, Jamie was to pay $989.73, which included unexplained "Uncollected Costs" and a "Partial Payment Balance," to cure the purported default. (*Id.* ¶¶ 73-74). Inexplicably, the amount due pursuant to the First August Notice was almost **$2,000 less** than the amount due pursuant to the earlier Reinstatement

August, 2010 showing escrow payment of $41.46 (since 2004) was due to increase as of October 1, 2010)).  BANA did not notify Jamie that it disputed anything contained in the Completion Letter.  In fact, BANA improperly failed to notify Jamie, during the bankruptcy or immediately afterwards, that she was in default ***prior to accelerating her debt and placing the Loan in foreclosure***. (SUMF ¶¶ 46-47).

[3] In or about mid-June, Jamie learned that the foreclosure sale was scheduled for August 2, though it was cancelled at the last minute for unknown "business reasons." (*Id.* ¶¶ 36, 63). Remarkably, BANA did not complete a foreclosure review prior to setting the sale date; instead, it waited over one month after the scheduled sale date to determine whether foreclosure was appropriate. (*Id.* ¶¶ 64-65).

Calculation, even though both documents included 11 months of allegedly past-due payments. (*Id.* ¶ 75). Jamie then received another "Notice of Intent to Accelerate" dated August 12 ("Second August Notice"). (*Id.* ¶ 78). This time, BANA represented that $1,370.73 was due to reinstate the Loan, almost **$500 more** than the amount due pursuant to the First August Notice, even though the First August Notice included seven additional allegedly past-due payments.[4] (*Id.* ¶¶ 79-81). Jamie did not receive any further correspondence from BANA regarding the amount due to reinstate the Loan after the Second August Notice. (*Id.* ¶¶ 86, 121, 123).

Along with the two August Notices, BANA'S foreclosure counsel McCalla & Raymer, LLC ("McCalla"), by letter dated August 11, advised that BANA would correct its records on August 16. (*Id.* ¶ 68). The letter advised that Jamie was to contact Paul Webb, then a Mortgage Servicing Manager in BANA's bankruptcy department, after August 16 to arrange to bring the Loan current through August. (*Id.* ¶¶ 69, 91). Less than 60 days later, on October 9, 2010, BANA sent Jamie's Loan back to foreclosure, although it did not complete a foreclosure review until November 16, 2011, and did not schedule a second foreclosure sale until January 2, 2012. (*Id.* ¶¶ 104-05, 123, 126).

BANA hired an "unauthorized third party" vendor, Titanium Solutions ("TS") to contact Jamie to set up a face-to-face meeting regarding her Loan. (*Id.* ¶ 106-07). BANA's records show that TS supposedly overnighted a letter to Jamie, confusingly requesting a meeting with a third-party vendor, and purportedly made visits to Jamie's home to speak with her. (*Id.* ¶¶ 108-10). BANA, however, cannot verify that the entries in its records are accurate, as they were made by

---

[4] The amounts set forth in the Reinstatement Calculation and the First and Second August Notices were subject to change before their due dates and thus were not necessarily the true amounts needed to reinstate the Loan, even if they had been correct. (*Id.* ¶¶ 42-43, 76, 82). And, although BANA previously required Jamie to make her payments by certified funds, neither of the August Notices stated that the payments had to be made in a particular manner. (*Id.* ¶¶ 83-85).

BANA employees who merely input the information they received from unidentified TS employees. (*See id.* ¶¶ 111-20). Jamie never received a visit, or correspondence requesting a face-to-face visit, from anyone with TS or BANA. (*Id.* ¶¶ 121-22).

Pursuant to McCalla's instruction, Jamie contacted Paul Webb ("Webb") by letter dated August 31, 2010 ("First QWR").[5] (*Id.* ¶ 97). Jamie requested that Webb provide the amounts due for each month from April through August, 2010, as well as the full amount needed to bring the Loan current through August. (*Id.* ¶ 98). Jamie also requested that Webb explain the charges included in the First August Notice, that he provide a complete account statement for the Loan from 2000 through August, 2010, and that he explain the 79 "Misc Posting" entries made on a prior, incomplete "loan history" that Jamie had received. (*Id.* ¶ 99). Jamie sent the First QWR by certified mail, which was received on September 7. (*Id.* ¶¶ 100-01). No one from BANA responded to the First QWR. (*Id.* ¶ 102; *see id.* ¶¶ 134-35).

Indeed, Jamie heard nothing further from BANA until over a year later when she received a notice dated November 18, 2011, stating that a foreclosure sale was scheduled for January 2, 2012 ("Sale Notice").[6] (*Id.* ¶¶ 123, 126). While the Sale Notice stated that the full outstanding balance and interest of the Loan, and "any other authorized charges," were immediately due, it did not provide an actual dollar amount to be paid. (*Id.* ¶¶ 124-25). By letter dated December 1, 2011 ("Second QWR"), Jamie again contacted Webb requesting that he respond to the First QWR. (*Id.* ¶¶ 127-28). Jamie also requested that Webb explain the fees and charges collected on the Loan since BANA took it over and that he provide the total amount then due to reinstate the Loan. (*Id.* ¶¶ 129, 131). Jamie demanded that BANA refund all illegal fees

---

[5] By letter dated August 16, Jamie's counsel also contacted Webb. Neither counsel nor Jamie received a response to that letter. (*Id.* ¶¶ 88-89).
[6] Notably, BANA claims it sent Jamie a letter dated November 30, 2011, informing her that her Loan had been referred to a Foreclosure Review Committee but that foreclosure would not necessarily occur. (Kovacs Decl. Ex. P).

and charges it had deducted from her monthly payments. (*Id.* ¶ 130). As with the First QWR, Jamie sent the Second QWR to Webb by certified mail and BANA received it on December 9, 2011. (*Id.* ¶ 132). No one from BANA responded to the Second QWR.[7] (*Id.* ¶ 133; *see id.* ¶¶ 134-35). Jamie's home was sold at the January, 2012 foreclosure sale and she and her family were evicted in March, 2012. (*Id.* ¶¶ 136, 140). Jamie's home sold for $47,050, over $45,000 of which BANA received and retained. (*Id.* ¶¶ 137-38).

BANA admits that it handled Jamie's Loan improperly. Once the bankruptcy trustee discharged Jamie's Loan, BANA's records should have shown the Loan as current and BANA should have resumed normal loan servicing. (*Id.* ¶ 94). Thus, instead of sending the Loan to foreclosure, it should have transferred the Loan to the loan counseling department. (*Id.* ¶ 70).[8] During 2011, instead of scheduling the foreclosure sale, BANA had the home inspected monthly, charging the fees to Jamie's account. BANA consistently valued Jamie's home at between $75,000 and $99,000. (*Id.* ¶ 139).

With regard to its purported efforts to set up a face-to-face meeting with Jamie after the home was put into foreclosure the second time, BANA admits "it would be essentially useless to reach out to this person [who input the notes regarding the purported efforts into BANA's system] if you had a question regarding the note because he or she just put it into the system." (*Id.* ¶ 115). Thus, BANA cannot verify whether any of the notes entered into its system regarding TS are accurate or whether TS actually took the actions noted. (*Id.* ¶¶ 112, 120). BANA also does not know whether someone from TS ever attempted to visit the home during non-business

---

[7] Jamie subsequently received a letter dated May 8, 2012, from BANA's attorneys at McGuire Woods in which they mentioned that BANA had established an "exclusive address" for handling QWRs; however, the record is devoid of any evidence that BANA ever property notified Jamie of an "exclusive address" for receipt of QWRs as required by 24 C.F.R. § 3500.21(e)(1). (SMF ¶¶ 142-44).

[8] BANA inexplicably took neither of these actions, wrongfully sending the Loan to foreclosure in July, 2010. (*Id.* ¶ 66). Additionally, before sending the Loan to foreclosure in July, 2010, BANA should have sent Jamie an acceleration notice, but it did not. (*Id.* ¶¶ 46-47).

hours, when Jamie may have been home from work. (*Id.* ¶ 117). If not, it would be impossible to conduct a face-to-face meeting with Jamie. (*Id.* ¶ 118).

Additionally, Webb admits that he did not respond in writing to the First or Second QWRs because "that's not our process" (even though it is mandated by law) and, in fact, BANA has no record of responding to the QWRs. (*Id.* ¶¶ 134-35). When asked about the "loan history" that McGuire Woods claimed was "easily understood," BANA's own representative could not explain the 79 "Misc Posting" entries and admitted that "[i]t's difficult to understand" without additional information. (*Id.* ¶¶ 149, 151-52).

Jamie put money aside each month in the amount of the monthly payments from June, 2010 through January, 2012, and was ready, willing, and able to resubmit the payments BANA initially rejected, along with the monthly payments from July, 2010 forward. (*Id.* ¶¶ 153-55).[9] But BANA refused to respond to her QWRs and inform her of the correct amount due. (*Id.* ¶¶ 135, 156, 159). As a result of BANA's actions, Jamie lived for two years in fear of losing her home, she and her family were eventually evicted and were forced to move into a trailer, Jamie was charged for late fees and other charges that she did not owe, and Jamie's account was improperly reported as delinquent to credit bureaus. (*Id.* ¶¶ 140, 162-63). Also as a result of BANA's actions and failures to act, Jamie suffered and continues to suffer depression, crying spells, sleeplessness, and almost daily migraine headaches for which she has had to be seen by a doctor and takes prescription medication. (*Id.* ¶ 164-65).

## LEGAL STANDARD

Summary judgment is not appropriate where genuine issues of material fact exist as to the elements of plaintiffs' claims. Fed. R. Civ. P. 56(c). The moving party has the burden of showing

---

[9] Over a year after Jamie's home was sold, BANA sent Jamie a notice stating that she owed $51,000 on the Loan. BANA admitted, as it must, that this, too, was wrong. (*Id.* ¶¶ 160-61).

that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The movant's burden can be met only by showing that the non-movant will not be able to establish the existence of an element essential to his case. *Id.* at 322. If the movant meets his burden, the burden shifts to the non-movant to show that there is a genuine issue of material fact. *Id.* at 324. There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). The Court may draw inferences from disputed facts, and the Court must resolve all reasonable doubts and justifiable inferences about the facts in favor of the non-movant. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993). If the record shows that factual issues exist, the Court must deny the summary judgment motion and proceed to trial. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

## LAW AND ARGUMENT

**I.     RESPA**

    **A.     BANA failed to Establish and Notify Jamie of an "Exclusive and Separate Office and Address" for QWRs.**

While RESPA's implementing regulations provide that mortgage servicers, like BANA, have the option of establishing a separate and exclusive office and address for receipt and handling of QWRs, a loan servicer wishing to do so must first notify the borrower of its designated office and address by utilizing one of two methods—either through the Notice of Transfer or in a separate mailing to the borrower.  24 C.F.R. § 3500.21(e)(1); *see also Catalan v. RBC Mortg. Co.,* No. 05 C 6920, 2008 U.S. Dist. LEXIS 52065, *22 (N.D. Ill. July 8, 2008) ("It is undisputed that the notice was not provided in a 'Notice of Transfer.' Therefore it was incumbent upon [the servicer] to provide notice of 'a separate and exclusive address for the receipt and handling of qualified written requests' in a document 'separately delivered' to

Plaintiffs.").  As explained by the *Catalan* court:

> The option of establishing a "separate and exclusive address" provides a powerful tool for servicers, for non-compliance by the customer can bar an otherwise potentially meritorious RESPA claim….Because RESPA is a consumer protection statute, …this Court must presume that HUD, in implementing the will of Congress, included the "separately delivered" requirement to ***ensure that borrowers would not be blindsided by notices of separate and exclusive addresses buried in the fine print of complex documents or conveyed subtly in communications from mortgage servicers***.  While neither Congress nor HUD specified any particular language for the notice, HUD did specifically require that ***the notice be conveyed in a separate document***.

*Catalan,* 2008 U.S. Dist. LEXIS 52065, \*\*22-23 (emphasis added).

In light of Paul Webb's testimony that it is not BANA's "process" to respond in writing to QWRs, BANA now attempts to shirk its responsibility to provide a written response to Jamie's QWRs by claiming that she failed to send them to BANA's purported "exclusive address." However, BANA has failed to point to any evidence that it ever properly notified Jamie of an alleged "exclusive office and address" for receipt and handling of QWRs either via a Notice of Transfer or another separate document. The only evidence upon which BANA relies in support of its assertion that it established an "exclusive address" for QWRs is an address for its ***customer service department*** buried in the fine print on the very last page of a monthly billing statement.  (Def.'s SUMF Ex. 12). This is the exact type of "notice" that the *Catalan* Court deemed insufficient to properly establish and notify a borrower of a separate and exclusive office and address for receipt and handling of QWRs under RESPA.  *Catalan,* 2008 U.S. Dist. LEXIS 52065, \*\*22-23.

Here, the undisputed evidence shows that BANA did not establish a "<u>separate and exclusive</u> office and address" at which it received and handled QWRs.  Instead, BANA merely directed borrowers to send QWRs and all other "general inquiries" to its regular ***customer***

*service department*.[10]   (Def.'s SUMF Exs. 12, 26, 28).   There is nothing separate or exclusive about this address.

At least one court has refused to grant summary judgment to a servicer where the "notice" was included in a Notice of Transfer, as permitted by RESPA, but was buried in the language of the notice and the allegedly "exclusive" address for QWRs was almost identical to the customer service address.  *Nash v. Green Tree Servicing, LLC*, No. 1:12-cv-278, Mem. Op., **16-18 (E.D. Va. May 2, 2013).  The *Nash* court noted that it is not clear that such a notice and address "satisfies the establishment of a separate and exclusive office for QWRs."  *Id.* at *17. Here, the purportedly "exclusive and separate" address provided by BANA is not just similar to the address for the customer service address; it *__is__* the customer service address.   Moreover, BANA's "notice" does not state that QWRs *__must only__* be sent to the given address.[11]   (*Id.*).

Because there is no evidence that BANA ever followed RESPA's guidelines to establish and notify Jamie of a separate and exclusive office and address for receiving QWRs, the relevant inquiry in determining whether BANA's duty to respond was triggered is whether BANA is

---

[10] Indeed, even BANA does not know what its purportedly "separate and exclusive" QWR address is; the address cited in its brief (at 10-11; *see also* Def.'s SUMF ¶ 11), while included on the last page of a monthly statement dated September 1, 2008, is different from the address included on the last page of two later statements. (*Compare* Def.'s SUMF Exs. 24-25 *with* Def.'s SUMF Exs. 26, 28).  BANA's misstatement of its own purported QWR address belies any claim that it notified Jamie (or any other of its borrowers) of the correct address to which QWRs (and other, general inquiries) must be sent.

[11] Two of the cases upon which BANA relies in support of its argument are distinguishable because the notices stated that QWRs <u>must</u> be sent to the specified addresses. *Berneike v. CitiMortgage, Inc*., 708 F.3d 1141, 1146 (10th Cir. 2013); *Steele v. Green Tree Servicing, LLC,* No. 3:09-cv-00603-D, Mem. Op. & Order, *5 (N.D. Tex. Sept. 7, 2010).  No such language appears in any of the correspondence Jamie received from BANA.  The third case to which BANA cites is also distinguishable as the plaintiff's RESPA claim was dismissed for failure to state a claim because the plaintiff sent her QWR to the servicer's designated agent for service of process, and did not allege or otherwise show either that the agent was authorized to accept QWRs for the servicer or that she sent the QWR to one of the servicer's general addresses.  *Malally v. BAC Home Loan Servicing, LLC*, No. 3:10-CV-0074-JTC-JFK, Final Rep. & Recommend., *22-24 (N.D. Ga. Oct. 8, 2010).  Where Jamie's counsel sent the February, 2012 letter is inapposite, as Jamie and her counsel had been attempting, and were continuing to attempt, to exhaust every possible option regarding where to send Jamie's complaints and inquiries, since BANA refused and failed to respond to prior attempts.

deemed to have actually **received** the QWRs.  *See* 12 U.S.C. § 2605(e)(2); *see Vought v. Bank of Am., NA,* 2010 U.S. Dist. LEXIS 114159 (C.D. Ill. Sept. 24, 2010) (holding that a servicer's "RESPA obligations are triggered by **receipt** of a QWR from a borrower" even when the borrowers sent their QWR to an address different from the servicer's "designated" address). Here, it is undisputed that BANA received Jamie's First and Second QWRs, both of which were delivered via confirmed certified mail. (SMF ¶¶ 100-01, 132). BANA admittedly failed to provide a written response to either QWR.  (*Id.* ¶¶ 133-35).

### B.    Jamie Could Not Bring Her Loan Current Because BANA Failed to Respond to Her QWRS.

In her QWRs, Jamie requested very specific information regarding the servicing of her Loan – the actual amounts BANA alleged were due and how the amounts were calculated, an accounting of her payment history on the Loan, and an explanation of the meaning of the "Misc Posting" entries on the Loan history. (SMF ¶¶ 97-100, 127-29). At all times, from June, 2010 through January, 2012, Jamie had funds set aside sufficient to pay the amounts due under the Note.  (SMF ¶¶ 153-55).  Thus, had BANA simply responded to her QWRs (or any of her other, numerous inquiries), Jamie could have, and indeed would have, paid the amount due to bring the Loan current and avoid foreclosure.  (*Id.* ¶¶ 155-56).  BANA admits, however, that it did not respond to the QWRs.  (*Id.* ¶¶ 133-35).  And, although BANA claims that it sent Jamie numerous notices regarding how much she needed to pay, the record evidence shows that the three notices contained conflicting, nonsensical amounts.  (*Id.* ¶¶ 39-44, 71-85).  And, each of the notices stated that the amounts purportedly due were subject to change and could actually be **higher** than the amounts the notices provided.  (*Id.* ¶¶ 42-43, 76, 82). Indeed, in its Second August Notice, dated August 12, 2010, BANA represented that $1,370.73 was due to reinstate the Loan, almost **$500 more** than the amount due pursuant to the First August Notice, which was dated just one

day earlier on August 11, 2010.[12]   (*Id.* ¶¶ 80-81).   BANA's argument that Jamie knew the amount needed to bring the Loan current defies logic.   According to BANA's fantastical theory, Jamie should have blindly paid the amount due contained in the Second August Notice, which was ***higher*** than the First August Notice that included ***seven additional*** allegedly past-due payments.[13]   (*Id.*).

BANA's allegation that Jamie failed to call or email Mr. Webb to make arrangements to pay the amounts due, when instead she wrote to him directly (and sent her correspondence via confirmed overnight delivery), is a distinction without a difference. (Def.'s Br. 12). Jamie's counsel contacted Mr. Webb by letter dated August 16, 2010.   Jamie then sent her First QWR to Mr. Webb on August 31, 2010.   BANA would have the Court believe that the First QWR was not an attempt to make arrangements to bring the Loan current, even though Jamie specifically stated that she received a letter from McCalla Raymer dated August 11, 2010 stating that "we owed monthly payments from [April, 2010] to bring our loan current.   ***What is the amount of these monthly payments?   What is the amount needed to bring our loan current through the end of August, 2010?***" (Def.'s SUMF Ex. 14) (emphasis added). Jamie tried again in December, 2011, sending Mr. Webb her Second QWR, in which she explicitly requested that Mr. Webb "tell [her] ***exactly how much I owe to bring this loan current and how you calculate it***.   ***We do***

---

[12] BANA contends that the notice dated August 12, 2010 was a "revised notice."   There is nothing on the face of the notice, however, to indicate that it was a revised version of the notice dated only a day earlier – August 11, 2010.   (Kovacs Depo. Ex. 10).   Indeed, the Second August Notice was $500 more than the First August Notice of the day before, even though the Second August Notice purportedly reflected that Jamie's account had been brought current (and thus included seven fewer months of payments than the First August Notice).   (*Compare* Kovacs Depo. Ex. 8 *with* Kovacs Depo. Ex. 10; *see* Def.'s Br. 5).   Thus, it certainly was not clear that the Second August Notice had been revised correctly and contained the correct amount due to reinstate the Loan. (*See* SMF ¶ 87).

[13] Contrary to BANA's allegation, McCalla did not inform Jamie or her counsel that her Loan had been brought current.   Instead, by letter dated August 11, 2010, McCalla informed Jamie and her counsel that her Loan would be brought current on August 16, 2010.   (Def.'s SUMF Ex. 23).   Thus, as of the date of the Second August Notice, Jamie had no reason to suspect that the Loan allegedly had already been brought current.

<u>**not want to lose our home that we have been living in for 15 years**</u>. (Def.'s SUMF Ex. 16) (emphasis added).  Mr. Webb admitted that he did not respond because it was not BANA's process to respond to Jamie's inquiries contained in the First and Second QWRs. (SMF ¶ 134). The record is devoid of evidence that Mr. Webb would have responded to Jamie's QWRs if she had emailed him instead of writing to him directly.

Further, there is no evidence that Jamie received the "hundreds of phone calls" that BANA claims were made to her. (Def.'s Br. 12-13). To the extent BANA's "unauthorized agent" Titanium Solutions purportedly made the calls, BANA admits that it has no way to verify whether the calls were actually made or who made the calls.[14]  (SMF ¶¶ 107, 112-16, 120). Moreover, Jamie's phone records do not show that she received hundreds of phone calls from BANA. (Def.'s SUMF Ex. 15). In fact, a large number of the phone calls BANA claims that Jamie received were placed **to a telephone number that does not even belong to Jamie**.[15] And, the record is devoid of evidence that Jamie would have received correct information regarding the amount due to bring the Loan current when BANA's own phone records show that these

---

[14] BANA similarly admits that it has no way to confirm that anyone associated with its "unauthorized agent" Titanium Solutions actually visited Jamie's home to discuss her Loan.  (SMF ¶¶ 110-111). Indeed, BANA admits that all of its records regarding Titanium Solutions' alleged attempts to contact Jamie were input by BANA employees based upon information provided by Titanium Solutions. Thus, BANA's records are based on hearsay and are not reliable evidence. (SMF ¶ 115). An examination of BANA's manually input phone call log compared with Jamie's Knology records for her home phone show that for all the calls BANA alleges Jamie must have had a conversation with someone from BANA due to the call length noted on Jamie's records, BANA's log shows that there was no answer and no message left by the caller.  In the few instances during December, 2011 where BANA claims to have either left a message or that Jamie hung up or refused a message, the call times on BANA's phone log do not match the times the phone calls occurred as shown on Jamie's records.  BANA's call log also reflects more calls being made than what actually occurred according to Jamie's records.  (*Compare* Ex. L to Kovacs Decl. [Doc. 41-3] *with* Jamie's home phone records [Doc. 28-8], *see* Exhibit A, hereto).

[15] Jamie has already provided BANA and the Court with evidence that the telephone number BANA refers to as "Home Phone 1" (706) 221-8989 actually belonged to a Mr. Taylor Groce and was the phone number for his appraisal business from early 2006 until March of 2012. (Pl.'s Resp. to Def's Mot. Compel & Groce Aff. attached thereto as Exh. A [Docs. 32 & 32-1]).  Mr. Groce testified that he repeatedly informed the persons calling for Jamie Rourk during that period that he was not Jamie Rourk and did not know Jamie Rourk.  Nevertheless, the calls continued and Mr. Groce eventually stopped answering.  (*See id.* ¶¶ 4-7).

phone calls were externally placed, automatically-dialed collection phone calls, likely made by Titanium Solutions.  (Kovacs Decl. Ex. L).

The evidence is clear: Jamie did not fail to try to pay her Loan and did not fail to make arrangements to bring the Loan current. BANA intentionally refused to provide her the correct amount due so she could make those arrangements. As a direct result of BANA's failure and refusal to respond to Jamie's QWRs, Jamie could not determine what amount to pay. Consequently, BANA wrongfully foreclosed upon Jamie's home, and Jamie and her family were forced to move into a modular home, which is essentially a trailer, and are now precluded from building their dream home. (J. Rourk Depo. 45, 102-03; V. Rourk Depo. 13-14, 43-46). Jamie also suffered emotional distress for which she has been treated by a doctor and takes prescription medication. (SMF ¶¶ 164-65).  The amount of Jamie's damages is an issue to be determined by the jury, but it is clear that Jamie was harmed by BANA's intentional, wrongful actions.

### C.      BANA's Claim that Jamie's RESPA Claim Arising from Her Second QWR "Fails for an Additional Reason" Fails as a Matter of Law.

BANA's claim that Jamie's RESPA claim arising from her Second QWR fails because "BANA obtained the legal right to foreclose on the Property before a response was required" under RESPA is without merit.  First, as discussed in greater detail within and in Jamie's Motion for Partial Summary Judgment, BANA *did not have the legal right to foreclose* on Jamie's home at the time it accelerated her debt and initiated foreclosure proceedings.  (*See* Part IV, infra). Moreover, even assuming BANA did have the legal right to foreclose when it sold Jamie's home, (which it did not), RESPA specifically contemplates that a QWR can be sent to a servicer for up to one year "after either the date of transfer of servicing or the date that the mortgage servicing loan was paid in full."  24 C.F.R. § 3500.21(e)(2)(ii); *see also Piland v. Nationstar Mortg., LLC,* 2013 U.S. Dist. LEXIS 21400, *9 (W.D. Wash. Feb. 15, 2013) (holding that "[i]t is

14

likely that Congress intended for mortgage accounts…to be governed by RESPA even after foreclosure."); *Zario v. Experian Info. Solutions, Inc.,* 2012 U.S. Dist. LEXIS 142097, *9-10 (N.D. Cal. Oct. 1, 2012) (holding that whether a servicer is considered a loan servicer for purposes of RESPA at the time it receives a QWR subsequent to a foreclosure sale is a factual question inappropriate for resolution on a Motion to Dismiss); *Larios v. Fed. Home Loan Mortg. Corp.,* 2011 U.S. Dist. LEXIS 57188 (C.D. Cal. May 24, 2011) (holding that a QWR sent to servicer within one year following foreclosure sale was timely under RESPA).

BANA received Jamie's Second QWR well ***before*** it actually sold her home at foreclosure. According to RESPA's implementing regulations, Jamie could have sent her QWR any time ***up to a year after*** BANA wrongfully sold her home at foreclosure and BANA would still have a legal duty to provide her with a proper written response. Nothing under RESPA provides that BANA's wrongful sale of Jamie's home at foreclosure extinguished BANA's legal duty to respond to Jamie's Second QWR.

## II.     CONVERSION

### A.     Jamie's Required Monthly Payment <u>Did Not Change</u> During Her Bankruptcy.

BANA's argument against the majority of Jamie's claims hinges on BANA's assertion that it notified Jamie of an increase in her escrow while she was in bankruptcy and that Jamie did not make the increased monthly payments to cover the purported escrow increase, but instead underpaid her Loan during this time. This contention is completely false.  The evidence clearly shows that BANA did not notify Jamie of any increase in her escrow amount while she was in bankruptcy likely because BANA's own records show that ***there was not any change in the required amount of Jamie's monthly mortgage payment during this time***.

Specifically, in August, 2010, Jamie accessed records for her account via BANA's

website that clearly show that while Jamie was in bankruptcy, her required, regular monthly payment to cover principal, interest and escrow on her loan remained at $394.83, the same amount it had been since 2004. (SMF ¶¶ 166-167).  Moreover, the sporadic billing statements that Jamie received from BANA during the bankruptcy show that her required monthly payment during this time was $394.83.  (*Id.*).  These records also show that BANA intended to increase Jamie's escrow from $41.46 a month to $194.64 a month, but not until at least **September 1, 2010**[16]—**six months *after* Jamie exited bankruptcy.**[17]  (SMF ¶ 169).  BANA has not produced any evidence that it notified Jamie via monthly billing statement or otherwise that her required monthly payment to cover principal, interest and escrow was any amount other than $394.83 while she was in bankruptcy, which is the same amount the trustee paid each month.  (SMF ¶¶ 13-16).

While Jamie's 2009 tax form 1098 reflects a negative balance in her escrow account in the amount of $1,128.39, this is **_not_** evidence that BANA ever increased Jamie's monthly required payment during the time she was in bankruptcy.[18]  (*See* SMF ¶ 168).  In fact, the negative balance in Jamie's escrow account reflected on her 2009 tax form 1098 shows that BANA was misapplying and converting her monthly payments and not depositing the proper amounts into

---

[16] The evidence shows that BANA did not actually increase Jamie's monthly payment until October 2010.  (*Compare* Def.'s SUMF Ex. 27 *and* Ex. 28.).

[17] Also, this increase was notably many months *after* Jamie tried making her April, May and June 2010 payments directly to BANA, payments that BANA rejected without justification.

[18] RESPA provides very specific guidelines governing mortgage servicers' maintenance of escrow accounts, including required annual notices that must be sent to borrowers, as well as specific regulations for recouping an alleged escrow deficiency or shortage.  *See generally* 24 C.F.R. § 3500.17.  These regulations also provide that a servicer may allow an escrow shortage or deficiency to exist and do nothing to change it.  24 C.F.R. § 3500.17(f)(4)(ii).  In addition, "[a] lender may not recover advances made on behalf of borrowers without at least an annual notice to the borrower of the advance and the resulting escrow deficiency."  *Payne v. Mortg. Elec. Reg. Sys., Inc.,* 387 B.R. 614, 637 (Bankr. D. Kan. 2008).

her escrow.[19] (*See* Part II. B, *infra*).  The record evidence shows that Jamie made the full, required monthly payments to BANA throughout her bankruptcy.

### B.    BANA Misapplied and Converted Portions of Jamie's Payments During Her Bankruptcy.

Because there was no change in the required monthly payment due to BANA while Jamie was in bankruptcy, and the trustee made all of the payments due to BANA during that time, the **_only_** logical explanation for BANA's insistence that Jamie's loan had a deficit of $3,225.19 (or any amount) at the time she exited bankruptcy is that BANA misapplied and converted portions of Jamie's monthly payments during the time she was in bankruptcy.  BANA's misapplication and conversion of portions of Jamie's monthly payments while she was in bankruptcy, which BANA likely allocated toward the payment of unlawful and unjustified fees and expenses, is confirmed by BANA's lawyers in its letter to Jamie's counsel dated August 11, 2011.  (Kovacs Depo. Ex. 9).  In this letter, BANA's lawyers state that BANA had "investigated the **_allocation_** of the funds received through [Jamie's] chapter 13 plan" and determined that BANA needed to correct its records to reflect Jamie as current on her loan through April 1, 2010.  (*Id.*).  A mortgage servicer's failure to properly apply borrowers' payments to their loan has been held to be a sufficient basis to support a claim for conversion.  *Johnson v. Citimortgage, Inc.,* 351 F.

---

[19] As BANA is well aware, specifically identifiable funds, **_and mortgage payments in particular_**, can, in fact, be subject to a claim for conversion.  *See e.g., Stroman v. Bank of Am. Corp.,* 852 F. Supp. 2d 1366, 1378-79 (N.D. Ga. 2012); *Blackburn v. Bank of Am. Home Loan Serv., LP,* No. 4:11-cv-39, 2012 U.S. Dist. LEXIS 182303 (M.D. Ga. Dec. 27, 2012).  As shown above, in June, 2010, BANA alleged that Jamie did not make eleven monthly mortgage payments from September 2009 forward.  BANA now contends that Jamie somehow underpaid her mortgage while in bankruptcy in the unexplained amount of $3,225.19, despite the fact that her required monthly payment never increased during that time.  Because Jamie made all of her mortgage payments in the required amount while she was in bankruptcy, and continued to do so (but for BANA's wrongful rejection) after exiting bankruptcy, the only explanation for these deficiencies is that BANA misapplied and converted her monthly mortgage payments, allocating her funds toward the payment of unlawful fees and expenses instead of properly crediting them to Jamie's loan.  Under Georgia law, these funds are the proper subject for a claim for conversion.  Likewise, the excess funds and improper fees and charges resulting from BANA's wrongful foreclosure of Jamie's home are identifiable and the proper subject for a claim for conversion.

Supp.2d 1368, 1372 (N.D. Ga. 2004); *James v. Litton Loan Serv.*, No. 4:09-cv-147, 2011 U.S. Dist. LEXIS 361 (M.D. Ga. Jan. 4, 2011)*; Blackburn v. Bank of Am. Home Loans Serv., LP,* No. 4:11-cv-39, 2012 U.S. Dist. LEXIS 182303 (M.D. Ga. Dec. 27, 2012).

By letter dated June 1, 2010, BANA informed Jamie that her home had been placed in foreclosure. (SMF ¶ 29). While BANA now claims that Jamie's account held a $3,225.19 deficit as a result of the alleged underpayment of escrow, in June, 2010, BANA informed Jamie that it was rejecting her payments because her loan was in default due to not having been credited with a payment since September 2009. (*Id.*). On June 10, 2010, Jamie faxed a letter to BANA showing that all of her payments had been made during bankruptcy and demanding that BANA straighten out her account and properly apply these payments to her loan. (SMF ¶ 32). Jamie's demand that BANA straighten out her account and apply her payments to her loan was met with the following reactions by BANA and its lawyers:

(1)     A letter dated June 16, 2010, from BANA's lawyers at McCalla Raymer demanding Jamie contact them to obtain a reinstatement amount and threatening her with foreclosure. (SMF ¶ 35).

(2)     A letter dated June 18, 2010, also from BANA's lawyers at McCalla Raymer, including copy of the Notice of Sale for Jamie's home scheduled for the first Tuesday in August, 2010. (*Id.* ¶ 36).

(3)     A Reinstatement Calculation dated June 22, 2010, from BANA informing Jamie that her loan was behind eleven monthly payments in the amount of $394.83 each, that her account had an escrow deficiency of $770.03, that various inspection and other foreclosure fees had been charged to her account, and demanding that Jamie immediately pay BANA $2,535.76 to reinstate her loan.[20] (*Id.* ¶¶ 39-43).

(4)     A Notice of Intent to Accelerate, dated August 11, 2010, from BANA demanding Jamie immediately pay $989.73 to cure the alleged "default." (*Id.* ¶¶ 71-77).

(5)     A Second Notice of Intent to Accelerate, dated August 12, 2010, from BANA demanding Jamie immediately pay $1,370.73, including late charges, to cure the purported "default." (*Id.* ¶¶ 78-82).

---

[20] On July 14, 2010, a second demand for BANA to straighten out Jamie's account and properly credit her payments to her Loan was made on Jamie's behalf by her attorney, Charlie Gower, via letter to BANA's attorneys at McCalla Raymer. (SMF ¶¶ 50-53).

Again, the evidence shows that the bankruptcy trustee made full payments during the bankruptcy and the required payment amount never changed during that time.  Thus, the ***only*** logical explanation for Jamie's loan to be eleven payments of $394.83 behind (or behind in any amount at all upon exiting bankruptcy), is that BANA was misapplying and converting her monthly payments while she was in bankruptcy.  The subsequent barrage of letters from BANA and its lawyers demanding additional payments from Jamie in various amounts in order to reinstate her loan and avoid foreclosure, rather than returning Jamie's funds to her by properly crediting them to her account, constitutes a refusal sufficient to complete the intentional tort of conversion. *See e.g., Johnson v. Citimortgage,* 351 F. Supp.2d 1368, 1372 (N.D. Ga. 2004); *James v. Litton Loan Serv.*, No. 4:09-cv-147, 2011 U.S. Dist. LEXIS 361 (M.D. Ga. Jan. 4, 2011)*; Blackburn v. Bank of Am. Home Loans Serv., LP,* No. 4:11-cv-39, 2012 U.S. Dist. LEXIS 182303 (M.D. Ga. Dec. 27, 2012).

To date, BANA has utterly failed to explain how it has come up with its current $3,225.19 figure other than to say it was due to a purported "escrow deficiency."  However, BANA has provided no evidence that the monthly payment on Jamie's loan was ever increased while she was in bankruptcy.  In addition, this $3,225.19 alleged "escrow deficiency" is almost ***$2,100.00 more*** than the alleged escrow deficiency reflected on Jamie's 2009 year-end tax form. (Def.'s SUMF Ex. 32).  And, it is ***over $2,400.00 more*** than the alleged escrow deficiency reflected in BANA's Reinstatement Calculation letter dated June 22, 2010.  (SMF ¶ 41).

BANA used this manufactured "underpayment" to justify its improper rejection of Jamie's April, May and June, 2010 payments, which ultimately resulted in the attempted wrongful foreclosure of Plaintiff's home in August, 2010 and the eventual wrongful foreclosure of her home in January, 2012.  (*See* Def.'s Br. 3).  It was BANA's obvious misapplication and

conversion of Jamie's monthly payments while she was in bankruptcy that was the catalyst for all the events that thereafter occurred.

If a plaintiff has shown title to property, possession by defendant, and a demand for the return of the property, the tort of conversion is ***complete*** at the time of the defendant's refusal to return the property and the defendant's liability for the tort of conversion ***cannot be extinguished*** by the plaintiff's subsequent recovery of the property.  *See Berry v. United of Omaha,* 719 F. 2d 1127, 1129 (11th Cir. 1983) (return of the property does not bar a claim for conversion). Therefore, while BANA alleges that it later "advanced" Jamie $3,225.19 in August 2010, the final act necessary to complete the tort of conversion already had been completed and the damage was already done.[21] Subsequent recovery of the converted property does not amount to a waiver of any right of recovery for the conversion, but instead merely goes to reduce the plaintiff's damages.  *Roebuck Auto Sales, Inc. v. Wallace,* 301 So.2d 546 (Ala. 1974); *see also Blackburn v. Bank of Am. Home Loans Serv., LP,* No. 4:11-cv-39, 2012 U.S. Dist. LEXIS 182303 (M.D. Ga. Dec. 27, 2012) (holding that even though Bank of America eventually corrected the plaintiffs' account by properly applying their payments to their loan, plaintiffs could still maintain a claim for conversion seeking compensation for their emotional distress damages resulting from Bank of America's intentional conversion).  Therefore, even if it can be determined that Bank of America eventually did return all of the misappropriated funds to Jamie by properly crediting them to her account, Jamie still is entitled to recover damages for her emotional distress resulting from BANA's conversion.

---

[21] In an effort to cover up its misapplication and conversion of Jamie's monthly payments while in she was in bankruptcy BANA now unconvincingly claims that Jamie "underpaid" her loan—even though there is no evidence that her required monthly payments ever increased during this time—and expects the Court to believe that BANA then ***gave*** Jamie $3,225.19 out of the goodness of its heart.  In reality, this $3,225.19 "gift" from BANA simply was BANA's attempt to return funds to Jamie that it had previously misapplied and converted.  Further, there is no evidence in the record that Jamie's escrow account ever had a deficiency in the amount of $3,225.19.

C.      **BANA also Converted Proceeds from the Wrongful Foreclosure and Sale of Jamie's Home.**

Even after BANA purportedly "corrected" its records, it continued to provide Jamie with nonsensical statements of the amount allegedly due to bring the Loan current.  (SMF ¶¶ 81-82, 148). And, the statements themselves stated that the amount provided was subject to change, and could increase by some unidentified amount.  (*Id.* ¶ 82). Despite Jamie's repeated attempts to obtain from BANA a correct statement of the total amount due, BANA intentionally refused to give her an accurate statement. As a result, Jamie was not able to reinstate the Loan (as was her right) and BANA sold the home at the Foreclosure Sale.

BANA claims that Jamie owed principal of $39,599.48 and interest of $6,150.29, as well as the $3,225.10 "credited" to accurately bring Jamie's account current. (Def.'s Br. 16). Had BANA's records shown Jamie's Loan as current when she exited bankruptcy (as Mr. Webb admitted would have been correct), Jamie would have (and indeed attempted to) made the monthly payments going forward. Even after BANA "advanced" funds to cover the alleged "deficit" in Jamie's account, BANA's own refusal to provide Jamie with an accurate and final amount due to bring the Loan current, minus the fees and expenses she did not owe, resulted in the unnecessary accrual of interest. And, as discussed above, the "credit" for the purported underpayments (of which there is no documented evidence) essentially was a bookkeeping entry made to cover up BANA's misapplication and conversion of portions of Jamie's payments made during bankruptcy. (*See* Webb Depo. 11-12, 41-42; Kovacs Depo. 131:4-8).  BANA should not be allowed to benefit from its own wrongdoing.

Not including the amounts BANA "lost" due to its own wrongdoing, BANA netted over

$2,000 that rightfully belonged to Jamie.[22] By retaining the fees, charges, and excess sale proceeds, BANA is liable to Jamie for conversion under Georgia law. Here, the undisputed evidence shows that Jamie's alleged default, and the subsequent foreclosure proceedings, was the direct result of BANA's intentional failure to properly apply her monthly payments both during and after her bankruptcy. BANA improperly invoked the power of sale and thus was not entitled to collect foreclosure fees and expenses. Consequently, BANA is liable to Jamie for conversion of those fees and expenses. (*See id.*). Similarly, the Security Deed requires that the proceeds from a foreclosure sale be allocated first to foreclosure-related expenses and then to the amounts due on the Loan, with the excess going to Jamie as the borrower. (SMF ¶ 10). BANA received a check in the amount of $47,050.00 at the foreclosure sale. (*Id.* ¶ 137). The expenses of sale totaled $1,239.37. (*Id.* ¶ 138). The amounts due on the Loan included principal of $39,599.48, fees of $3,898.02, and an escrow deficiency of $1,280.56.15 (*Id.*). Thus, BANA received, and retained, $2,271.94 in excess funds, which are readily identifiable,[23] as well as $5,178.58 in improper fees and escrow charges, also readily identifiable,[24] that rightfully belonged to Jamie. BANA's motion for summary judgment fails with regard to Jamie's conversion claim.

## III.   BREACH OF CONTRACT

Under Georgia law, the elements for a breach of contract claim "are merely the breach and the resultant damages to the party who has the right to complain about the contract being broken." *Odem v. Pace Acad.,* 235 Ga. App. 648, 654 (1998); *Int'l Fid. Ins. Co. v. BMC Contrs., Inc.,* No. 5:06-cv-186, 2009 U.S. Dist. LEXIS 63098 (M.D. Ga. July 14, 2009); *see also Brenner v. Future Graphics, LLC,* No. 1:06-cv-0362, 2006 U.S. Dist. LEXIS 98271, *13-14 (N.D. Ga.

---

[22] BANA paid attorneys' fees of just over $1,000 out of the foreclosure proceeds. Since the sale itself was unlawful, those fees should not have been paid and instead belonged to Jamie.  (*See* Doc. 19 at 14-15).
[23] Excluding the attorneys' fees related to the wrongful Sale, $39,599.48 in principal + 3,898.02 in fees + $1,280.56 in escrow = $44,778.06.  Sale funds of $47,050 - $44,778.06 = $2,271.94 in excess funds.
[24] Improper fees of $3,898.02 + $1,280.56 of improper escrow charges = $5,178.58.

Nov. 14, 2006). Here, the evidence shows that BANA breached the terms of Jamie's Loan Documents in several ways, including: (1) misapplying and refusing to accept Jamie's payments (SMF ¶¶ 19-28); (2) charging Jamie impermissible fees and other charges that she did not owe (*Id.* ¶¶ 40, 72-76, 82); and, (3) invoking the power of sale when it was not authorized to do so under the terms of the Security Deed. (*Id.* ¶¶ 18, 29-31, 48, 102, 104, 120-23, 133-35).

### A.   Jamie's Loan was Current when She Exited Bankruptcy.

Despite BANA's repeated assertions that Jamie "underpaid" her loan while she was in bankruptcy, as discussed above, the evidence shows that Jamie made all of her payments, ***in the amount BANA required***, while she was in bankruptcy.  (*See* Part II. A, *supra*). The evidence also shows that upon being discharged from bankruptcy, Jamie's loan should have been completely current through March 31, 2010 with the payments made by the bankruptcy trustee, enabling Jamie to begin sending her monthly payments to BANA on her own starting with the April 2010 payment.[25]  (SMF ¶¶ 13-18).

BANA alleges that it returned Jamie's April, May and June, 2010 payments (even though it had the April and May payments in its possession as cash), because it requires payments be made via certified funds when a loan is in default.  (Def.'s Br. 3). This explanation is problematic for multiple reasons.  First, BANA claims that Jamie's Loan was in default because she made insufficient payments after an alleged escrow increase during her bankruptcy.  The evidence shows, however, that this allegation is false as the amount required by BANA for Jamie's monthly payment ***did not change*** from $394.83 the entire time she was in bankruptcy.

---

[25] Jamie sent her April 2010 payment directly to BANA via electronic funds transfer, which BANA accepted on April 27, 2010.  (SMF ¶¶ 19-20).  The following month, Jaime made her May payment directly to BANA via electronic funds transfer which BANA accepted on May 19, 2010.  (*Id.* ¶¶ 22-23).  BANA then, without justification, returned Jamie's May 2010 payment to Jamie's bank via wire transfer on May 21, 2010, and subsequently also returned Jamie's April 2010 payment in the same manner on June 9, 2010. (*Id.* ¶¶ 21, 24).  Jamie attempted to make her June 2010 payment directly to BANA, but it was also rejected.  (*Id.* ¶ 28).

(SMF ¶¶ 167, 169).

Second, because Jamie had made all of her payments during bankruptcy in the required amount and exited bankruptcy current on her loan, BANA had no right to reject her payments beginning in April 2010.  Paul Webb, BANA's current Assistant Vice President, Mortgage Servicing Unit Manager in the bankruptcy department, admitted that BANA's records should have shown Jamie's loan as current upon her discharge from bankruptcy.  (SMF ¶ 94).  Jamie's loan was not in default as BANA contends, so BANA's purported policy of requiring certified funds does not apply and there is nothing in Jamie's loan documents that requires her to ever make her payments in any specific format, certified funds or otherwise. (*Cf.* Kovacs Decl. ¶ 11; *see* Kovacs Decl. Exs. A, B).  BANA's wrongful rejection of Jamie's April, May and June 2010 payments, even though it held cash for these payments in its possession, was the initial material breach of contract that was the triggering event for all of the subsequent issues concerning Jamie's loan.[26] As a result of BANA's initial breach, Jamie was damaged as BANA erroneously considered her to be in default, inflated her loan with late charges and other fees, accelerated her debt and ultimately foreclosed upon her home. (SMF ¶¶ 25-27, 29, 36-37, 62, 66, 94, 136, 140, 156).

### B.    BANA Failed to Comply with the HUD Regulations, which are Contractual Conditions Precedent to Debt Acceleration and Foreclosure.

---

[26] A well-established general tenant of contract law is that the first party to materially breach a contract cannot be heard to complain when the other party to the contract subsequently fails to perform. *See Martin v. Rollins, Inc.,* 231 S.E.2d 751 (Ga. 1977) (holding that the party to a contract who is shown to have breached first "forfeit[s] their right to insist that the other party to the contract strictly comply with its terms."); *In re Castaways/Hidden Harbor Partners, Ltd.,* 64 B.R. 404 (Bankr. M.D. Ga. 1986) (holding that "general principles of contract law bar [the creditor], as the first party who breached…from subsequently complaining of the Debtor's breach…."); *Frost v. Wells Fargo Bank, N.A.,* 2012 U.S. Dist. LEXIS 143584, *24 (W.D. Mich. Oct. 4, 2012) (Under the "first breach doctrine," the first party to breach a contract "cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."); *CCD, L.C. v. Millsap,* 2005 UT 42, P29 (Utah 2005) (same); *Mathews v. PHH Mortg. Corp.,* 724 S.E.2d 196, 198-99 (Va. 2012) ("[I]f the first breaching party committed a material breach,…that party cannot enforce the contract.").

Jamie has, in fact, identified the provisions of the Loan Documents that BANA breached. Jamie's Security Deed expressly incorporates the HUD Regulations into the contract and itself acknowledges that the lender may not accelerate the debt or foreclose where its right to do so is limited by the HUD Regulations: "Lender may, ***except as limited by regulations issued by the Secretary in the case of payment defaults***, require immediate payment in full…."  (SMF ¶ 6) (emphasis added).  The Security Deed also explicitly states as follows:

> In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid.  ***This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.***

(*Id.* ¶ 7) (emphasis added).   Based on the plain language of Jamie's Security Deed–which expressly incorporates the HUD Regulations as contract terms–BANA is required to satisfy HUD's preconditions prior to being authorized to accelerate Jamie's debt or initiate foreclosure proceedings. (*Id.*).  BANA's failure to satisfy these contractual conditions precedent gives rise to liability for breach of contract. *Mathews v. PHH Mortg. Corp.,* 724 S.E.2d 196, 198-99 (Va. 2012).[27]

Pursuant to 24 C.F.R. § 203.604, the mortgagee must "have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, ***before*** three full monthly installments due on the loan are unpaid.  24 C.F.R. § 203.604(b). This face-to-face meeting is mandatory if the mortgaged property is within 200 miles of the mortgagee, its servicer, or a branch office of either.  *Id.* § 203.604(c). The regulation requires that ***a minimum*** of one letter

---

[27] *See also Kersey v. PHH Mortg. Corp.,* 682 F. Supp. 2d 588, 596 (E.D. Va. 2010), *vacated on other grounds*, 2010 U.S. Dist. LEXIS 82802 (E.D. Va. Aug. 13, 2010) (mortgagee's failure to comply with HUD regulations incorporated into the contract could give rise to liability for breach of contract); *Mullins v. GMAC Mortg., LLC,* C.A. No. 1:09-cv-00704, 2011 U.S. Dist. LEXIS 35210 (S.D. W.Va. Mar. 31, 2011) (same); *Sinclair v. Donovan,* C.A. No. 1:11-cv-00010, 2011 U.S. Dist. LEXIS 128220 (S.D. Ohio Nov. 4, 2011) (incorporated HUD regulations become enforceable terms of the mortgage contract); *Shelton v. Wells Fargo Bank, N.A.,* 481 B.R. 22, 30 (Bankr. W.D. Mo. 2012) (breach of contract action may lie where HUD regulations are incorporated into deed of trust).

attempting to arrange a face-to-face meeting must be sent *by certified mail* to the mortgagor. *Id.* § 203.604(d). In addition, the mortgagee must make at least one physical trip to the mortgagor's home to discuss her mortgage. *Id.*

Under the express terms of Jamie's Security Deed, BANA could only accelerate the amounts due under the Loan, and subsequently foreclose on Jamie's home, if it first satisfied the HUD Regulations' face-to-face requirements *before* three full, monthly payments were past due. The undisputed evidence shows that BANA failed to satisfy the conditions precedent as required. (SMF ¶¶ 29-31, 39, 45, 48, 104, 108, 120-23). In failing to do so, BANA breached the Loan Documents and therefore, BANA was not authorized to foreclose on Jamie's home. (*See* Part IV, *infra*).

## IV.   ATTEMPTED WRONGFUL FOCLOSURE AND WRONGFUL FORECLOSURE

The record evidence shows that BANA is liable for attempted wrongful foreclosure and, in fact, for wrongful foreclosure, because: (1) Jaime was not in default on her Loan; instead, BANA failed to give her credit for several of her payments (*Id.* ¶¶ 13-18); (2) BANA wrongfully refused to accept her payments (*Id.* ¶¶ 19-28); (3) it invoked the power of sale when it was not authorized to do so under the terms of the Loan Documents (*Id.* ¶¶ 29-31, 39, 45, 48, 104, 108, 120-23) (4) it failed to provide Jamie with a realistic opportunity to reinstate her Loan as was her right under the Security Deed (*Id.* ¶¶ 37-38, 39, 42-45, 48-49, 58-62, 71-82, 86-87); and (5) BANA failed to comply with the HUD Regulations which are incorporated into the Security Deed as contractual conditions precedent to foreclosure.[28]

---

[28] BANA's contention that Jamie's claim for attempted wrongful foreclosure must fail because she did not include a separately enumerated count titled "attempted wrongful foreclosure" in her Complaint is without merit. Jamie's Complaint contained the necessary allegations to sustain a claim for attempted wrongful foreclosure and to put BANA on notice of the existence of such claim. Specifically, Jamie has alleged that despite being on notice that Jamie was not in default on her loan, and without first satisfying its prerequisite duties under the terms of her Security Deed and the incorporated HUD Regulations,

A.      **Attempted Wrongful Foreclosure**

As to the first foreclosure sale BANA scheduled – and subsequently cancelled – on August 2, 2010, BANA is liable to Jamie for attempted wrongful foreclosure. Under Georgia law, a claim for attempted wrongful foreclosure is recognized where a foreclosure action is commenced, but not completed, if the plaintiff can show that the defendant knowingly and intentionally published "untrue and derogatory information concerning the debtor's financial condition" and that damages were sustained as a result. *Hauf v. HomeQ Servicing Corp.,* No. 4:05-cv-109 (CDL), 2007 U.S. Dist. LEXIS 9439, *17 (M.D. Ga. Feb. 9, 2007). In the instant case, Jamie provided BANA with proof that she was completely current on her Loan as of March 2010.  Indeed, BANA's own records confirm that the trustee paid the full amount due each month- $394.83. (SMF ¶¶ 13-17, 166-169). Jamie also made her payments under the terms of the Loan in April, May, and June of 2010; however, BANA wrongfully rejected those payments. (*Id.* ¶¶ 20-21, 23-28). Nevertheless, and without prior notice, BANA accelerated Jamie's debt and placed her home into foreclosure. (*Id.* ¶ 29). On July 2, 2010, BANA published notice that Jamie's home was to be sold at foreclosure on August 2, 2010. (*Id.* ¶ 48.) BANA wrongfully undertook to foreclose on Jamie's home despite having consistently received full monthly payments from the trustee and numerous letters and calls about its erroneous records. (*Id.* ¶¶ 13-

---

BANA wrongfully scheduled her home for sale at foreclosure on August 2, 2010, which sale was subsequently cancelled at the last minute for reasons unknown to Jamie.  (Complaint ¶¶ 20-22, 24, 55-63).  Jamie also attached multiple letters to her Complaint detailing the wrongful nature of the foreclosure sale BANA had scheduled (and subsequently cancelled) for August 2.  (*See generally* Compl. Ex. 7). For instance, in her Second QWR, Jamie specifically informed BANA that it had "run foreclosure notices against us in the past and are now running them in the paper against us now for our home to be foreclosed upon and sold on the courthouse steps on January 3, 2012."  (*Id.*).  In addition, Jamie's counsel sent BANA a letter dated August 16, 2010, specifically alleging that BANA wrongfully "ran a foreclosure ad on her home for the entire month of July and it was only on the day of the foreclosure sale that she learned that the foreclosure was called off."  (*Id.*).  Jamie's counsel further informed BANA that as a result of BANA's wrongful attempted foreclosure Jamie suffered depression for which she had sought medical treatment.  (*Id.*).  These allegations meet the notice pleading standard sufficient to sustain a claim for attempted wrongful foreclosure.

17, 32-34, 49-50, 58-62).

If the borrower is not in default, as Jamie was not in this case, yet the lender publishes the notice of sale for foreclosure, then the lender may be liable for attempted wrongful foreclosure. *Hauf,* 2007 U.S. Dist. LEXIS 9439 at *17. Here, BANA published the Notice of the August 2 foreclosure sale despite not being authorized to accelerate Jamie's debt or initiate foreclosure proceedings under the terms of her Security Deed, thereby publishing untrue information about Jamie's financial condition. Accordingly, BANA is liable for attempted wrongful foreclosure.

### B.       Wrongful Foreclosure

Contrary to BANA's argument, BANA did owe Jamie a duty separate from those set forth in the Loan Documents. Under Georgia law, a lender has a <u>duty</u> to exercise fairly the power of sale contained in a security deed. O.C.G.A. § 23-2-114. "Where a grantee does not comply with the statutory duty under O.C.G.A. § 23-2-114 to exercise fairly the power of sale in a deed to secure debt, the debtor may sue for damages for the tort of wrongful foreclosure." *DeGloyer v. Green Tree Servicing*, 662 S.E.2d 141, 147 (Ga. Ct. App. 2008); *Stimus v. CitiMortgage, Inc.,* No. 5:10-cv-435, 2011 U.S. Dist. LEXIS 71240, *6 (M.D. Ga. July 1, 2011). A wrongful foreclosure claim can arise when the creditor has ***no legal right to foreclose***. *DeGloyer,* 662 S.E.2d at 147.

As previously stated, the undisputed evidence shows that Jamie was not in default on her Loan and any "default" status was created by BANA through its misapplication and conversion of Jamie's payments made during her bankruptcy. (*See* Part II. B, *supra*). The Security Deed does not authorize BANA to accelerate the Loan and initiate foreclosure when the "default" status is the result of BANA's own actions (and inactions). (*See generally* Kovacs Decl. Ex. B). Thereafter, by failing to correct its records in a timely manner, giving Jamie different, conflicting

28

information about the amounts due on the Loan, and refusing to respond to Jamie's inquiries and QWRs, BANA did not exercise the power of sale fairly as required by O.C.G.A. § 23-2-114. The Security Deed provides that Jamie could reinstate the Note, ***even after foreclosure proceedings began***, by tendering "in a lump sum all amounts required to bring Borrower's account current." (SMF ¶ 9) (emphasis added). It follows, then, that to reinstate the Loan, Jamie would need to ***know*** all the amounts required to bring her account current. BANA utterly and intentionally failed to give her this information before putting the Loan in foreclosure and selling her home.[29]

Instead of verifying to Jamie the ***correct*** amount needed to reinstate the Loan, the undisputed evidence shows that BANA gave her three different, nonsensical amounts in less than two months. The Reinstatement Calculation in June required Jamie to pay over $1,800 (subject to change) determined by a calculation that wrongly included 11 months of purportedly past-due payments (and which BANA admits was incorrect). (*Id.* ¶¶ 39-44). Then, just over a month later, BANA sent the First August Notice, which required Jamie to pay just under $1,000 (again subject to change), even though it too was based on 11 alleged past-due payments. (*Id.* ¶¶ 71-76). And, just a day later, BANA sent the Second August Notice requiring Jamie to pay over $1,300 (subject to change, of course) based on seven ***fewer*** months of purportedly missed payments than the prior two documents. (*Id.* ¶¶ 78-82). As far as Jamie knew, BANA had not corrected its records when it sent the Second August Notice, having been advised that the records would be corrected almost a week later on August 16. (*Id.* ¶ 87). And, the amount due did not make sense compared to the Reinstatement Calculation and the First August Notice. (*Id.*). Indeed, almost two years later, after Jamie and her family were evicted, BANA's attorneys stated that the amount due as of August 31, 2010 was $1,842.33 (almost $500 more than the amount stated in the

---

[29] Of course, Jamie should not have had to reinstate her Loan, because she was never in default in the first place.

Second August Notice) plus late charges – the ***fourth different amount*** given to Jamie in writing.  (SMF ¶ 148).

BANA purposefully misapplied Jamie's payments during her bankruptcy and wrongfully placed Jamie's Loan into foreclosure as a result.  It then intentionally ignored Jamie's numerous requests, both before and after the August 2 sale date, to verify the actual, full and correct amount needed to reinstate the Loan. In failing to do so, BANA intentionally and unfairly denied Jamie her right to reinstate the Loan as provided in the Security Deed. The undisputed evidence shows that BANA proceeded to sell her home, knowing that Jamie was willing and able to bring the Loan current. (*See, e.g.*, *id.* ¶¶ 50-51, 53, 154). BANA's conduct amounts to an unfair exercise of the power of sale.

In addition, as discussed above, BANA had no legal right to exercise the power of sale, accelerate Jamie's loan, and initiate foreclosure proceedings because it failed to comply with the HUD Regulations which are incorporated into Jamie's Security Deed as contractual conditions precedent to foreclosure. *Mathews*, 724 S.E.2d at 201-03. (Part III. B, *supra*).

Prior to BANA being authorized to accelerate Jamie's debt and initiate foreclosure proceedings, the HUD Regulations (and Jamie's Security Deed) require that the mortgagee either have a face-to-face interview with the mortgagor, or at a minimum, "make a reasonable effort to arrange such a meeting, ***before three full monthly installments due on the mortgage are unpaid***." 24 C.F.R. § 203.604(b) (emphasis added).  Accordingly, a reasonable effort to arrange a face-to-face meeting ***must consist of*** (1) a minimum of one letter sent to the mortgagor via certified mail ***and*** (2) at least one trip to see the mortgagor at the mortgaged property.  24 C.F.R. § 203.604(d); *Countrywide Home Loans v. Wilkerson,* No. 03 C 50391, 2004 U.S. Dist. LEXIS 4034, *2-3 (N.D. Ill. Mar. 12, 2004).

BANA contends that it satisfied its duty to make a reasonable effort to arrange a face-to-face meeting with Jamie with a mailing dated September 14, 2011, sent to Jamie by an "unauthorized" third-party vendor **via Fed-Ex** (which Jamie did not receive), paired with multiple visits made to Jamie's home by an unidentified BANA "agent."[30] (Def's Br. 28). This argument fails. First, 24 C.F.R. § 203.604(d) specifically requires BANA to send Jamie a letter "certified by the **Postal Service** as having been dispatched," not Fed-Ex. *See Mortg. Assocs. v. Smith,* No. 1986 U.S. Dist. LEXIS 16907, **2-3 (holding that "certified mail" as used in 24 C.F.R. § 203.604(d) means first class mail for which proof of delivery is secured).[31]  Second, even assuming that a mailing sent to Jamie via Fed-Ex was sufficient to satisfy BANA's obligation (and it is not), the September 14, 2011 mailing does not seek to arrange a face-to-face meeting between BANA and Jamie, but rather states that a representative from the "unauthorized" third-party vendor, Titanium Solutions, would be coming to visit Jamie at her home to collect various documents for BANA's review.  (SMF ¶¶ 107-09).

Finally, subsection (e)(1) makes clear that the only activities BANA is permitted to outsource to a third-party vendor under section 203.604 are telephone calls to the mortgagor and the one required trip to see the mortgagor at the mortgaged property for purposes of attempting

---

[30] Although BANA contends that it "corrected" its records in August, 2010 to show that Jamie was current on her Loan payments through March, 2010, BANA still wrongfully considered Jamie to be in default by at least *four full monthly payments as of August* due to its improper rejection of Jamie's payments for April, May and June 2010.  (SMF ¶ 79, 104, 158). However, it is undisputed that BANA *did not make any reasonable efforts* to arrange a face-to-face meeting, in the form of either a certified letter or a personal visit to Jamie's home, prior to three full monthly payments being due (in June) as required by 24 C.F.R. § 203.604.  BANA also contends that it made "hundreds" of phone calls to Jamie attempting to arrange a face-to-face meeting; this contention is irrelevant as telephone calls cannot take the place of the required certified letter.  Furthermore, as previously discussed, Jamie did not receive any of these phone calls and the evidence shows that a large number of the phone calls were made to a phone number that did not even belong to Jamie.  BANA has not produced any evidence that the purpose of any of these phone calls was to attempt to set up a face-to-face meeting.
[31] *See also Leatherbury v. Greenspun,* 939 A.2d 1284, 1288-1289 (Del. 2007)(unambiguously holding that "the term 'certified mail' has a common usage with only one meaning that *does not include delivery by Federal Express*.") (emphasis added).

31

to arrange the face-to-face meeting with BANA.[32]   24 C.F.R. § 203.604(e)(1).   BANA is not permitted to outsource to a third-party vendor the required act of sending the certified letter or actually having the face-to-face meeting.   *See* 24 C.F.R. §§ 203.604 (b), (d), (e)(1). Here, it is undisputed that BANA never sent Jamie a certified letter in an attempt to arrange a face-to-face meeting, and therefore, BANA cannot claim to have fulfilled its duty to make a reasonable effort to arrange such a meeting as required by 24 C.F.R. § 203.604(d).   Moreover, BANA did not have the required face-to-face meeting with Jamie and thus, did not satisfy the requirements of 24 C.F.R. § 203.604(b).

The undisputed evidence shows that BANA failed to satisfy these requirements prior to accelerating Jamie's loan and initiating foreclosure proceedings and, as a result, it did not have the legal right to exercise the power of sale. (SMF ¶¶ 29-31, 39, 45, 48, 104, 108, 120-23). Yet it knowingly and intentionally did so anyway. (*See id.* ¶¶ 95, 136).

Compliance with the incorporated HUD Regulations is a condition precedent to foreclosure, in the same manner that Georgia law requires a 30-day written notice of foreclosure by registered or certified mail to the debtor before the lender may foreclose under a power of sale. *See e.g.,* O.C.G.A. § 44-14-162.2(a). Just as a wrongful foreclosure claim arises when the lender fails to follow a statutory condition precedent to foreclosure, *Roylston v. Bank of Am., N.A.,* 660 S.E.2d 412, 417 (Ga. Ct. App. 2008), it may also arise when the lender fails to follow a **contractual** condition precedent to foreclosure. As recently held in *McGinnis v. Am. Home Mortg. Serv., Inc.,* No. 5:11-cv-284, 2013 U.S. Dist. LEXIS 92556, *45 (M.D. Ga. July 2, 2013), in a wrongful foreclosure claim, "there is a breach of duty if the foreclosing party violates **provisions of the loan instruments** or Georgia law." *Id.* (emphasis added) (citing *Heritage*

---

[32] A mortgagee's ability to outsource completion of even these activities may be limited to those instances where the mortgagor's property is defined as "Indian land" pursuant to section 248 of the National Housing Act.  24 C.F.R. § 203.604(e)(1).

*Creek Dev. Corp. v. Colonial Bank,* 601 S.E.2d 842 (Ga. Ct. App. 2004)).[33] Because BANA did not satisfy the HUD Regulations incorporated into the Security Deed as contract terms, it had no legal right to accelerate Jamie's debt and foreclose on her home. BANA's failure to satisfy these contractual conditions precedent to foreclosure shows that the power of sale was not exercised fairly as BANA had no legal right to foreclose. BANA's actions constitute wrongful foreclosure under Georgia law.

## V.   PUNITIVE DAMAGES AND ATTORNEYS FEES AND EXPENSES.

Subject to the Court's discretion, RESPA expressly provides for the recovery of attorney's fees and litigation costs if Jamie prevails on her RESPA claim. 12 U.S.C. § 2605(f)(3). When mortgage servicers are found to have violated their duties under RESPA, courts routinely award plaintiffs their attorney's fees. *See e.g., Wright v. Litton Loan Serv. LP,* No. 05-cv-02611, 2006 U.S. Dist. LEXIS 15691, *12 (E.D. Pa. 2006); *Nosek v. Ameriquest Mortg. Co.,* 2006 Bankr. LEXIS 2350 (D. Mass. Sept. 19, 2006) (awarding plaintiff $45,000.00 in attorneys' fees and $2,395.80 in costs even when only nominal damages were recovered under RESPA).  Thus, summary judgment is not appropriate on Jamie's claim for attorneys' fees and litigation expenses as a matter of law.

In addition, Georgia law provides that where a defendant has acted in bad faith, been stubbornly litigious, or caused the plaintiff unnecessary trouble and expense, it is within the jury's purview to award expenses of litigation.  O.C.G.A. § 13-6-11. Whether BANA has acted in such a manner towards Jamie is a question for the jury to be determined from its consideration

---

[33] *See also Khadija v. Fannie Mae,* No. 1:12-cv- 02519, 2012 U.S. Dist. LEXIS 181420, *19 (N.D. Ga. Nov. 30, 2012) (citing *Heritage Creek*).  In *Heritage Creek,* the appellate court stated that when a lender does "precisely what it was entitled to do according to the provisions of the loan instruments and Georgia law," then the lender is entitled to judgment as a matter of law on the wrongful foreclosure claim. 601 S.E.2d at 846. The corollary of this rule is that if the lender violates the loan agreement, then it could be subject to a wrongful foreclosure claim.

of the facts and circumstances in this case.  *Tyler v. Lincoln,* 272 Ga. 118 (2000).

Punitive damages may be awarded in tort actions where clear and convincing evidence proves that defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care which would raise the presumption of conscious indifference to the consequences. O.C.G.A. § 51-12-5.1.  A conscious indifference to the consequences relates to "an intentional disregard of the rights of another." *Tyler,* 272 Ga. at 120. The issue of whether punitive damages should be awarded is ordinarily a jury question. *Fitzsimons v. W.M. Collins Enters., Inc.,* 271 Ga. App. 854, 857 (2005).

Likewise, it is a question for the jury as to whether BANA acted or failed to act with specific intent to cause harm.  O.C.G.A. § 51-12-5.1(f).  "Intent" is defined to denote either that a person desires the consequences of his act or believes that the consequences are substantially certain to result from it.  *Vitau v. Fred Dean, Inc.,* 203 Ga. App. 801, 805 (1992).  Because Jamie has stated viable claims against BANA for intentional torts (i.e., attempted wrongful foreclosure, wrongful foreclosure, conversion) as well as allegations that BANA's tortious misconduct arose to the level of maliciousness and a conscious disregard for Jamie's rights, the jury may award punitive damages under O.C.G.A. § 51-12-5.1 and BANA's motion for summary judgment as to this claim should be denied.

## VI.    EMOTIONAL DAMAGES

As BANA well knows, federal district courts in multiple circuits have held that "actual damages to the borrower" recoverable under the remedial consumer protection statute RESPA, include "non-economic damages" such as mental anguish, emotional distress, and pain and suffering.  *See Johnstone v. Bank of Am., N.A.,* 173 F. Supp. 2d 809, 814-816 (N.D. Ill. 2001) ("RESPA allows actual damages for emotional distress."); *Carter v. Countrywide Home Loans,*

C.A. No. 2009 U.S. Dist. LEXIS 31446, *7-9 (E.D. Va. April 14, 2009) (same).[34]

BANA is also well aware that emotional distress damages are recoverable for "well-recognized intentional torts when the plaintiff proves the essential elements of the well-established tort and that the intentionally tortious conduct proximately caused the emotional distress damages." *Blackburn v. BAC Home Loans Serv., LP,* No. 4:11-cv-39, 2012 U.S. Dist. LEXIS 182303 (M.D. Ga. Dec. 27, 2012) (holding that plaintiffs were entitled to pursue their claim for conversion when their only remaining damages were emotional damages); *see also Hamilton v. Powell, Goldstein, Frazer & Murphy,* 252 Ga. 149 (1984) ("[W]hen the claim is for intentional misconduct, damages for mental distress may be recovered without proof of physical injury."). Jamie has not, and need not, allege a separate cause of action for intentional infliction of emotional distress in order to recover for her emotional distress damages proximately caused by BANA's intentional, tortious conduct. *Blackburn,* 2012 U.S. Dist. LEXIS 182303, **37-38. Jamie has alleged the intentional torts of attempted wrongful foreclosure, wrongful foreclosure and conversion for which a jury may award her emotional damages.

## <u>CONCLUSION</u>

Based on the foregoing, Jamie respectfully requests that the Court deny BANA's motion for summary judgment and allow this case to proceed to a trial by jury.

Respectfully submitted this 15th day of July, 2013.

---

[34] *See also Wright v. Litton Loan Servicing LP,* C.A. No. 05-02611, 2006 U.S. Dist. LEXIS 15691, *9-10 (E.D. Pa. 2006) (holding that "actual damages" under RESPA "includes damages for non-economic losses, such as pain, suffering and emotional distress."); *McLean v. GMAC Mortg. Corp.,* C.A. No. 06-22795-CIV, 2008 U.S. Dist. LEXIS 36143, *32-33 (S.D. Fla. May 2, 2008); *Rawlings v. Dovenmuehle,* 64 F. Supp. 2d 1156, 1164-1165 (M.D. Ala. 1999); *Ploog v. HomeSide Lending, Inc.,* 209 F. Supp. 2d 863, 870 (N.D. Ill. 2002) ("RESPA's actual damages provision includes recovery for emotional distress.").

CHARLES A. GOWER, P.C.

/s/ *Charles A. Gower*
CHARLES A. GOWER
Georgia Bar No. 303500
MIRANDA J. BRASH
Georgia Bar No. 475203

1425 Wynnton Road
P.O. Box 5509
Columbus, GA   31906
(706) 324-5685

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing "PLAINTIFF'S RESPONSE IN OPPOSITON TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF" was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically serves email notification of such filing to the attorneys of record, each of whom is a registered participant in the Court's electronic notice and filing system and each of whom may access said filing via the Court's CM/ECF system:

Andrew G. Phillips, Esq.
McGuire Woods LLP
1230 Peachtree Street, N.E.
Promenade II, Suite 2100
Atlanta, GA 30309-3534

This 15th day of July, 2013.

/s/ *Charles A. Gower*